UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------x

NEW YORK SMSA LIMITED PARTNERSHIP d/b/a
VERIZON WIRELESS,

                                        Plaintiff,                    COMPLAINT

                   -against-                                          DOCKET NO.:

THE TOWN OF BEDFORD, THE TOWN OF BEDFORD
TOWN BOARD, THE TOWN OF BEDFORD PLANNING
BOARD and ALBERTO CIRACO, BUILDING INSPECTOR
(in his official capacity),

                                        Defendants.

-------------------------------------------------------------------------------x

New York SMSA Limited Partnership d/b/a Verizon Wireless ("Verizon" or "Plaintiff"), by its attorneys Snyder & Snyder, LLP, as and for its Complaint against the Town of Bedford ("Town"), the Town of Bedford Town Board ("Town Board"), the Town of Bedford Planning Board ("Planning Board") and Alberto Ciraco, in his official capacity as the Town Building Inspector ("Building Inspector") (collectively, the "Defendants" ), respectfully alleges as follows:

Nature of the Action

1.      The nation's wireless infrastructure is a critical communications pathway extensively employed and heavily relied on by the public—including residents and businesses, the traveling public, emergency service providers, hospitals and health care professionals, law enforcement personnel, government officials, and the 911 North American emergency system—and is increasingly serving as a replacement for traditional wireline phones altogether. Both Congress and the Federal Communications Commission ("FCC") have emphasized the importance of a seamless nationwide wireless network and the need to allow wireless carriers to move quickly to fill gaps in their coverage.

This case involves just such a federally licensed wireless carrier attempting to fill identified coverage gaps in service in the Town.

2.      This action arises from the Defendants' unreasonable and unsupportable denial of the Plaintiff's application for a special permit and site plan approval ("Special Permit") to install a public utility wireless telecommunications facility ("Hickory Lane Application") on the property located at 91 Hickory Lane in the Town ("Hickory Lane Property").

3.      The proposed public utility wireless telecommunications facility on the Hickory Lane Property ("Hickory Lane Facility") consists of a 115-foot tall monopole designed to resemble a flagless flagpole (hereinafter "slim stick") with related equipment within a fenced 35 foot by 57 foot compound on the over 17 acre Hickory Lane Property.

4.      This action also arises from the Defendants' unreasonable and unsupportable denial of the Plaintiff's alternative application for a Special Permit to install a public utility wireless telecommunications facility ("Stone Hill Application") on the property located at 68 Stone Hill Road in the Town ("Stone Hill Property").

5.      The proposed public utility wireless facility ("Stone Hill Facility") on the Stone Hill Property consists of a 150-foot tall monopole designed to resemble a tree (hereinafter "stealth tree") with related equipment within a fenced 26.5 foot by 35 foot compound on the over 4 acre Stone Hill Property.

6.      The Stone Hill Facility is an alternative to the Hickory Lane Facility. The Hickory Lane Facility and the Stone Hill Facility are collectively referred to herein as the "Facilities."

7.      Verizon prefers the Hickory Lane Facility due to, among other things, the robust coverage that the Hickory Lane Facility will provide compared to the Stone Hill Facility. Nevertheless, Verizon submitted the Stone Hill Application in response to the Planning Board's

direction.

8.      Until December 2018, the Town regulated wireless telecommunications facilities like the proposed Facilities pursuant to the Town of Bedford Code ("Town Code"), Section 125-85.2 entitled Cellular Towers ("Cellular Law").

9.      Due to the filing of the Hickory Lane Application prior to 2018, the Planning Board reviewed the Hickory Lane Facility under the Cellular Law.

10.     In December 2018, the Town Board amended the Cellular Law with a new Section 125-85.2 of the Town of Bedford Code entitled Wireless Telecommunications Facilities ("Wireless Law").

11.     Due to the filing of the Stone Hill Application in 2020, the Planning Board reviewed the Stone Hill Facility under the Wireless Law.

12.     The Town Code, both the Cellular Law and Wireless Law, specifically allows new communications towers to be located at the Hickory Lane Property and the Stone Hill Property pursuant to Special Permit approval from the Planning Board.

13.     A special permit use is deemed a permitted use under New York law when the objective and express special use permit criteria under the local zoning code are met.

14.     For wireless facilities, like the Facilities here, the special permit criteria include specific setbacks from adjacent properties, which are greater than other uses.

15.     The Hickory Lane Facility meets all of the special permit criteria of the Town Code, including all of the specific setback requirements for wireless facilities under the Town Code.

16.     The Stone Hill Facility meets all of the special permit criteria of the Town Code, including the specific setback requirements for wireless facilities, except for a front yard setback and a side yard setback, which the Planning Board has the authority to reduce under the Town Code.

3

17.     The purpose of the Facilities is to support and operate antennas and related equipment for Verizon to provide reliable personal wireless services to fill what the Town's own professional wireless consultants confirmed is a gap in coverage.

18.     The Town hired three wireless consultants to review the applications: (i) Professional Engineer Ronald Graiff; (ii) The Center for Municipal Solutions; and (iii) CityScape Consultants Inc.

19.     All three of the Town's wireless consultants confirmed Verizon's coverage gap and the need for Verizon to provide adequate service to the area.

20.     When constructed, either of the Facilities will provide personal wireless services (including those for E911 emergencies) to emergency personnel, first responders and members of the public living, working, and travelling through the area, as well as in the vicinity of surrounding roads, homes, and businesses.

21.     The voluminous administrative record extensively details the exhaustive efforts undertaken by Verizon to identify appropriate, code-compliant, and technologically viable locations for the Facilities.

22.     The administrative record also confirms that either of the Facilities present the only feasible options to fill Verizon's confirmed gap in coverage and enable Verizon to provide adequate service to the subject area.

23.     Verizon's essential wireless services are needed to place those living in and passing through the area on equal footing with homes, businesses, and travelers throughout the state who have access to wireless communication and data services, in furtherance of the national policy goal that Congress and the FCC have repeatedly confirmed (i.e., to facilitate the rapid deployment of wireless access so as to ensure that all Americans have access to this critical service).

24.     Unfortunately, bowing to strident community opposition, the Defendant Planning

Board issued a written decision denying both the Hickory Lane Application and the Stone Hill Application pursuant to a resolution filed on March 31, 2021 ("Denial Resolution").

25. The Defendant Planning Board failed to make the necessary and required findings of fact or conclusions of law to support the Denial Resolution.

26. The Denial Resolution is based on specious grounds that are not supported by substantial evidence in the record.

27. The Denial Resolution equates to a prohibition on the provision of personal wireless services because the proposed Facilities are the only feasible and least intrusive means for closing the significant gap in personal wireless coverage in the subject area.

28. The Denial Resolution equates to a prohibition on the provision of personal wireless services because it materially inhibits the Plaintiff's ability to provide its services and to compete in a fair and balanced regulatory environment.

29. In the Denial Resolution, the Defendant Planning Board wholly disregarded the uncontroverted evidence in the record, including opinions of its own wireless consultants, regarding Verizon's existing significant gap in reliable wireless coverage and the ability of the Facilities to provide reliable wireless coverage to remedy the gap.

30. As set forth herein, the Defendants' actions violate Section 704 of the Telecommunications Act of 1934, as amended by the Telecommunications Act of 1996 (the "Telecommunications Act") (codified at 47 U.S.C. § 332(c)(7)(B)), because (a) the Denial Resolution and the terms of the Town Code have effectively prohibited personal wireless services; (b) the Denial Resolution is not based on substantial evidence contained in the written record; and (c) the Denial Resolution and terms of the Town Code regulate the placement of wireless facilities based upon the environmental effects of radio frequency emissions and upon an illegal technological preference.

Each of these actions warrant a reversal of the denial together with injunctive relief mandating that the Town issue all required approvals for the construction of the Hickory Lane Facility (or in the alternative, the Stone Hill Facility) pursuant to the Telecommunications Act.

The Parties

31.    Verizon is a New York limited partnership with an address at One Verizon Way, Basking Ridge, New Jersey 07920.  Verizon is licensed by the FCC to provide wireless telephone and telecommunications services throughout New York State, including commercial mobile services and personal wireless services to the public as those terms are used and defined under federal law, including in Section 332(c)(7)(B) of the Telecommunications Act.

32.    Defendant Town is a municipality duly organized and existing under the laws of the State of New York, having an address at Town Hall, 321 Bedford Road, Bedford Hills, NY 10507.

33.    Defendant Town Board is the duly constituted town board of the Town of Bedford, empowered under the laws of the State of New York and responsible for the enactment of the Town Code, decisions related to the sale and lease of Town owned property, and the general supervision of the Town, having an address at Town Hall, 321 Bedford Road, Bedford Hills, NY 10507.

34.    Defendant Planning Board is the duly constituted planning board of the Town of Bedford, empowered under the laws of the State of New York and the Town Code to grant the zoning approvals sought herein, having an address at 425 Cherry Street, Bedford Hills, NY 10507.

35.    Defendant Building Inspector Alberto Ciraco is the Building Inspector of the Town of Bedford and is responsible in his official capacity to issue building permits, having an address at 425 Cherry Street, Bedford Hills, New York 10507.

Jurisdiction and Venue

36.    This Court has subject matter jurisdiction over this action pursuant to: (a) 47 U.S.C. §

332(c)(7)(B)(v) of the Telecommunications Act, because the Plaintiff has been adversely affected and aggrieved by the Defendants' actions in violation of § 332(c)(7)(B) of the Telecommunications Act; and (b) 28 USC § 1331, because this is a civil action that presents federal questions arising under the Telecommunications Act.

37.     This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202.

38.     This Court has personal jurisdiction over the Defendants in that the Defendants committed the specific acts complained of herein and are located in the judicial district for the United States District Court, Southern District of New York.

39.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the claims stated herein arose in the judicial district for the United States District Court, Southern District of New York, and the Defendants reside in this District.

Expedited Review Requirement

40.     Expedited review of this action is required pursuant to § 332(c)(7)(B)(v) of the Telecommunications Act (providing that "[t]he court shall hear and decide such action on an expedited basis").

The Important Federal Interests at Issue in This Case

41.     The United States of America has declared that there is a public need for wireless communication services such as "personal wireless services," as set forth in the Telecommunications Act, and the FCC rules, regulations and orders promulgated pursuant thereto.

42.     The Telecommunications Act was intended by Congress to "provide for a pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies to all Americans."  H.R.

Rep. No. 104-458, at 206 (1996) (Conf. Rep.); *See* 1996 U.S. Code Cong. and Adm. News, p. 10.

43. The FCC regulates the provision of personal wireless services to the public.

44. The FCC licenses providers of personal wireless services to use limited resources, frequencies, and spectrum allocated by the FCC for the provision of such services to the public.

45. Federal law preempts state and local law with respect to the technical and operational aspects of wireless services, and there can be no local technology preferences or requirements. Pursuant to Congress's explicit delegation, the FCC has the rule-making power to regulate "technical requirements for use of the spectrum and equipment in the personal [wireless] services." See 47 C.F.R. § 24.50.

46. The Telecommunications Act, while preserving state and local authority over the placement, construction, or modification of wireless facilities, expressly preempts state or local governments from effectively prohibiting the provision of personal wireless services and from implementing decisions that are not supported by substantial evidence.

47. Section 332(c)(7) of the Telecommunications Act imposes a number of procedural and substantive limitations on local zoning decisions to ensure that those decisions do not frustrate the Telecommunications Act's goals of promoting competition, higher quality services, and the rapid deployment of new telecommunications technologies.

48. Section 332(c)(7)(B)(i) provides that:

> The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof –
>
> (I)   shall not unreasonably discriminate among providers of functionally equivalent services; and
>
> (II)   shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

49. Section 332(c)(7)(B)(ii) provides that:

> A State or local government or instrumentality thereof shall act on any request for authorization to place, construct or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

50. Section 332(c)(7)(B)(iii) requires that:

> Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

51. Section 332(c)(7)(B)(iv) provides that:

> No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

52. Section 332(c)(7)(B)(v) provides that:

> Any person adversely affected by any final decision or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis…

53. Section 253 of the Telecommunications Act also provides that:

> No State or local statute or regulation or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

54. This action is ripe for determination under the Telecommunications Act and was timely filed.

55. Verizon provides the infrastructure for the provision of mobile telephone and other personal wireless communication services in the State of New York in accordance with FCC licenses.

56. The Hickory Lane Facility and the Stone Hill Facility are personal wireless service

facilities.

57.     The FCC's granting of licenses to Verizon as a wireless carrier constitutes a finding that the public interest will be served by the services sought to be deployed, consistent with the public policy as formulated by Congress "to make available so far as possible, to *all* people of the United States . . . a rapid, efficient, nationwide and worldwide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, for the purpose of promoting safety of life and property through the use of wire and radio communication." 47 U.S.C. § 151 (emphasis added).

58.     Verizon's customers communicate through handsets, mobile telephones, and other media via a network of personal wireless service facilities, each of which operates at low wattages and uses the finite amount of the radio frequency spectrum allotted by the FCC.

59.     Pursuant to the federal mandates described herein, telecommunications facilities are part of the nation's critical infrastructure and further a national policy to extend wireless services to all areas of the United States and to provide broadband services, which by virtue of the emerging technology and increasing demand includes the Facilities at issue here.  These federal mandates are evidenced in numerous laws adopted by Congress, FCC regulations and recent decisions, and other federal policies.

<u>The State and Local Government Zoning Requirements</u>

60.     Because of the essential nature of its services, Verizon is considered a public utility under New York decisional law for zoning purposes.

61.     As a public utility, Verizon is entitled to a less rigorous standard of review with regard to any applications for approval of a personal wireless service facility by State and local zoning authorities such as the Defendants.

62.     Under Chapter 125 of the Town Code, Article VII and Article VIII, Section 125-85.2 *et seq.* (referred to as the Cellular Law and Wireless Law herein) and Article IX, Section 125-86 *et seq.,* the Planning Board has approval authority to issue Special Permits and site plan approval for all new construction of wireless telecommunications facilities, such as the Hickory Lane Facility and Stone Hill Facility.

63.     Under Chapter 125 of the Town Code, Article XII, Section 125-125 of the Town Code and under New York State law, the Building Inspector shall issue all building permits, and administer and initially interpret the Town Code.

The Wireless Service Sought To Be Provided

64.     The provision of wireless services is only possible through the installation of numerous interconnected wireless facilities that collectively serve to create a wireless network.

65.     Typically, a wireless facility consists of several flat panel antennas, which may be mounted on existing tall structures or attached to a tower or monopole, along with other associated equipment necessary for the operation of that facility. In the instant case, the Hickory Lane Facility is a "slim stick" with all antennas inside the pole and concealed from view; the Stone Hill Facility is a "stealth tree" monopole with antennas concealed in the branches.

66.     Each wireless facility services a specific geographic area, the exact radius of which is dependent upon the details of corresponding "hand-off" sites and topography, including the terrain, the existence of trees and buildings, and other obstructions which impact the effectiveness and propagation of the radio frequency signals utilized in the provision of wireless services.

67.     Existing gaps in personal wireless service coverage and increasing demand for wireless services by the public require the installation of additional wireless facilities by Verizon across the State of New York, and specifically in and around the Town.

68.    The Facilities at issue here are designed to ensure the continued provision of wireless services with the requisite coverage needed for reliable voice, data, and other services for use by the public on a daily basis, and which will also enable residents and travelers to access emergency service providers.

69.    The provision of adequate wireless service (i.e., coverage) is extremely important considering the increased reliance on mobile telephony for access to emergency services.  Many emergency personnel and first responders rely upon wireless networks not only for secure encrypted wireless communications, but also for use of Mobile Data Terminals ("MDTs") which have become commonplace in emergency vehicles.  For example, police, ambulance and other emergency first response providers use MDTs to transmit critical data (i.e. police use MDTS to download license plate information; ambulance providers use MDTs to transmit the vital signs of a patient en route to the hospital; and firefighters use MDTs to download information on a building to be better prepared to combat a fire).

70.    Generally, the siting of wireless communications facilities is somewhat inflexible, as in any given search area, there will be a limited number of feasible locations from which a wireless facility is capable of providing adequate service to the target area.

71.    Wireless transmissions are propagated at a very low power level compared to those used for radio and television. For this reason, the radio signals can travel only a limited distance and are impeded by topography and vegetation. Hills, ridges, buildings, and even foliage can attenuate or completely block the radio signals, which is why wireless coverage can be better in the winter (when leaves are off the trees) than in the summer. The technology is considered essentially "line of sight," requiring antennas to find or "see" network devices and vice versa to enable reliable communication.

12

This is why wireless antennas must be placed above trees and high enough to "see" over nearby hills, ridges or buildings.

72.     The topography in this area of the Town is significant with respect to coverage.  Large hills and ridges block the signal from existing and alternative sites.

73.     To be properly sited and function within Verizon's network, a wireless facility must provide reliable wireless service to the target area (i.e. population centers, major transportation corridors, commercial and residential areas, etc.), and must be located to be capable of reliably "handing off" communications to another adjacent wireless facility within Verizon's network.

74.     Verizon's radio-frequency ("RF") engineers and consultants conducted detailed technical analyses (with both drive test data and propagation maps) utilizing accepted industry standard predictive modeling tools to determine where wireless facilities must be installed in order to provide the reliable coverage needed to address the topographical and technological limitations involved in furnishing wireless services in this area, which encompasses roads, residences, and businesses.

75.     Unlike wireline communications, wireless service cannot be piped or wired to users from a distant facility.  Instead each wireless facility itself is the "generating" facility with radio waves linking users to wireless service.

76.     As a result of these technological requirements and limitations, the necessary location for the installation of a wireless facility is wholly unrelated to state or municipally created districts or boundaries.

The Background to the Lengthy Town Process

77.     As detailed herein, the Planning Board's review of Verizon's applications took nearly five years to complete and was an extremely contentious process.  There were residents fiercely

13

opposed to the construction of a wireless facility in their neighborhood while other residents pleaded for a wireless facility to provide reliable wireless service to the area.

78.     During this process, Verizon evaluated over 25 alternate siting options, including stealth church steeple installations, small cells, shorter macro cell facilities, multiple site options, and all of the alternatives the Planning Board suggested.  However, none of these alternate siting options constituted feasible alternatives to the Facilities proposed by Verizon.

79.     Despite the significant coverage gap identified by Verizon and confirmed by the Town's own consultants, the Planning Board acted in manner which demonstrated that it had no intention to approve any wireless facility to remedy that gap. The Chair of the Planning Board even stated as recently as September 22, 2020 that "we prefer our town the way it is and we're willing to live with bad cell service."

80.     Therefore, the Planning Board used every ploy imaginable to delay the applications. Ultimately, pursuant to the federal shot clock, Verizon demanded a decision by no later than March 31, 2021.  The Planning Board finally issued the Denial Resolution on that date.

81.     Verizon prefers the Hickory Lane Facility over the alternative Stone Hill Facility since the Hickory Lane Facility will enable Verizon to remedy its long-standing coverage gap in the southeastern portion of the Town, including the Bedford Village area. Put simply, it will provide more coverage to the subject area than the Stone Hill Facility.  Further, the Hickory Lane Facility complies with all applicable provisions of the Town Code, including the setback requirements.

The Plaintiff's Applications

Hickory Lane Application

82.     On July 18, 2016, Verizon filed the application for site plan approval and a Special Permit with the Planning Board for the Hickory Lane Facility in accordance with the Town of

14

Bedford's Cellular Law.

83.     The application included, among other things, (a) Zoning Drawings, (b) Verizon's Radio Frequency Affidavit ("RF Affidavit"), (c) an Alternate Site Analysis, (d) a Radio Frequency Safety Report ("RF Safety Report"), and (e ) a full Environmental Assessment Form ("EAF").  The Hickory Lane Facility, as originally proposed in 2016, consisted of a 150-foot tall monopole with antennas in a 52 foot by 60 foot compound on the 17.7 acre Hickory Lane Property.

84.      Verizon's RF Affidavit included propagation maps detailing the gap in coverage and that the Hickory Lane Facility would remedy such gap. The Alternate Site Analysis documented that there are no existing structures with existing antennas on which Verizon could collocate its antennas and that no Town owned property was available except for parkland or property in close proximity to parkland which was not permitted to be utilized under the Cellular Law. The RF Safety Report demonstrated that the Hickory Lane Facility would comply with the FCC requirements for RF exposure. The EAF detailed that there would be no significant adverse impacts to the environment and included the New York State Historic Preservation Office ("SHPO") concurrence stating that there are No Historic Properties in the Area of Potential Effects.

85.     On September 13, 2016, the Planning Board held the first public hearing regarding the Hickory Lane Application and several residents voiced their opposition to the Hickory Lane Facility.

86.     In connection therewith, a large number of residents submitted a letter dated September 7, 2016 demanding that the Town deny the application for health reasons stating that "WE DO NOT WANT the adverse health effects and increased cancer rates."

87.     At the September 13, 2016 hearing, the Planning Board introduced its first wireless consultant, Ronald Graiff, a New York State Licensed Professional Engineer ("Mr. Graiff") to review the need for the Hickory Lane Facility and presented Verizon with Mr. Graiff's letter requesting

additional documentation.

88.     At the September 13, 2016 hearing, the Planning Board requested title documentation regarding Verizon's access to Hickory Lane Property in response to neighbors' statements that Verizon had no legal access to the public road, Hickory Lane, from the Hickory Lane Property.

89.     Verizon submitted a cover letter, dated October 27, 2016, and a title policy ("Title Policy") from First American Title Insurance Company insuring Verizon's leasehold interest in the Hickory Lane Property including Verizon's right of access to the public road, Hickory Lane, from the Hickory Lane Property.

90.     The Title Policy affirmatively insures Verizon's pedestrian and vehicular access to the Hickory Lane Property from Hickory Lane.

91.     After receiving the Title Policy in 2016, the Planning Board never asked Verizon for any more details regarding its legal rights to access the Hickory Lane Property from Hickory Lane.

92.     During several hearings on the Hickory Lane Application, Verizon's engineers, Tectonic Engineering Consultants, Geologists & Land Surveyors ("Tectonic"), testified that the Hickory Lane Facility is unmanned, generating no traffic impact with maintenance visits only once a month, and the existing access way from the Hickory Lane Property to Hickory Lane would not need to be widened for the construction or operation of the Hickory Lane Facility.  In order to reach the Hickory Lane Facility, all that would be necessary would be to extend the existing access way.  The engineers also demonstrated that the access way's extension would have sufficient space to accommodate the turnaround of emergency vehicles.

93.     Following the initial September 13, 2016 hearing, the Bedford Presbyterian Church ("Church") contacted Verizon to determine whether Verizon could utilize the Church steeple to collocate antennas in order to provide coverage to the Bedford Village Historic District, which had

been identified as part of the area lacking service.

94. The Church is in the Bedford Village Historic District. The Cellular Law prohibited any wireless facilities in the Bedford Village Historic District.

95. Nevertheless, Verizon and the Church worked on a stealth installation wherein antennas would be concealed from view entirely by installing them within a small portion of the Church steeple. In order to do so, a small portion of the Steeple would need to be replaced with RF transparent material.

96. By memorandum dated January 19, 2017, the Bedford Village Historic District Review Commission ("Commission") advised the Planning Board that the Church had contacted the Commission about allowing antennas in the Church steeple. The Commission stated it was not in favor of the proposal and did not want the Town to amend the Cellular Law to allow facilities in the Bedford Village Historic District.

97. On March 10, 2017, the Planning Board sent a letter to Verizon's historical and environmental consultant, TriLeaf, stating that the Planning Board was opposed to the Church's proposal to utilize the Church steeple for antennas.

98. Prior to the Planning Board's March 21, 2017 meeting, Verizon submitted a detailed RF Report, dated February 28, 2017, and prepared by C Squared Systems ("C Squared"), Verizon's RF consultant, to address Mr. Graiff's comments.

99. C Squared's Report, dated February 28, 2017, included drive test data and detailed propagation maps which demonstrated the existing gap in coverage and that the Hickory Lane Facility would remedy the gap.

100. At its March 21, 2017 meeting, the Planning Board confirmed that the Planning Board would attend Verizon's balloon test on March 25, 2017. The Planning Board requested that the

17

Verizon take photographs from many locations (private and public) in order to determine the visual impact of the Hickory Lane Facility.

101.    The balloon test involved flying a balloon at the height of the Hickory Lane Facility and taking photographs at locations of interest to assist in determining the approximate location and height of the Hickory Lane Facility.

102.    During the balloon test on March 25, 2017, Tectonic took photographs from 30 locations including all of the locations that the Planning Board had requested, as well as from many other locations.

103.    On May 25, 2017, Verizon submitted a Visual Resource Evaluation ("VRE") dated May 11, 2017, prepared by Tectonic which detailed the results of the March 25, 2017 balloon test. Of the 30 locations, the Hickory Lane Facility was only visible from 6 viewpoints.  The VRE found that the "Facility will not result in any adverse visual impact to the surrounding area, and will not interfere with or reduce the enjoyment or appreciation of the appearance of any inventoried resource."

104.    Despite requests, the Planning Board held no meetings regarding the Hickory Lane Application between March and November of 2017.  However, the Town of Bedford Director of Planning Jeff Osterman ("Planning Director") called Verizon's counsel and requested that the VRE be supplemented with: (a) additional photographic simulations of the Hickory Lane Facility showing antennas from three other carriers, (b) additional photographic simulations of the Hickory Lane Facility using photographs from Planning Board members at the balloon test; and (c) evidence that the simulations in the VRE were accurate by providing a comparison of the photographic simulations of other wireless facilities to photographs of the constructed wireless facilities.

105.    In response to the Planning Director's request for more visuals, the VRE was supplemented with the requested material in a report dated October 2017.

18

106.   On November 28, 2017, the Planning Board held a meeting regarding the Hickory Lane Application. During the meeting and as noted in the minutes, the Chair of the Planning Board stated that the VRE appeared complete and "did do a good job of identifying those areas where you could see the balloon from those you could not."

107.   In further response to Mr. Graiff, C Squared provided another report regarding the Hickory Lane Facility, dated November 28, 2017, with additional coverage maps and drive test data that included signal strength of -105dBm, a lower threshold than the -95 dBm and -85 dBm that Verizon typically utilizes for reliable coverage in the subject area.  The dBm levels are RF thresholds used to determine coverage to an area.

108.   The C Squared report, dated November 28, 2017, concluded that "even at the -105 dBm RSRP threshold requested by Mr. Graiff, a significant gap in coverage exists in the vicinity of the Site and the proposed Facility at the Site will remedy such significant gap in coverage."

109.   C Squared highlighted in its report that Verizon's significant gap in coverage includes major roadways in the Town, including State roads such as NYS Route 172 (Pound Ridge Road), along with County Highway 3 (Long Ridge Road), Middle Patent Road and Mianus River Road.

110.   Mr. Graiff requested further additional information to document that none of the alternate sites even at -105 dBm would provide the necessary coverage.  C Squared prepared another report, dated December 11, 2017, which documented that none of the alternate sites, namely 65/69 Stone Hill Road, 945 Old Post Road or 1055 Old Post Road, would provide the necessary coverage.

111.   At its February 13, 2018 meeting, the Planning Board declared the Hickory Lane Application complete and acknowledged receipt of three communications.

112.   The first communication was the report from Mr. Graiff, dated December 26, 2017.

113.   The Graiff report stated:

FINDING: Verizon Wireless has demonstrated that there exists a significant gap in coverage in the area which it seeks relief. Pursuant to Federal requirements it is entitled to seek, so as to fill in those gaps, any sites that meet that need. Notwithstanding that finding, there is insufficient evidence to determine if the height proposed at the 91 Hickory Lane Site is the minimum required to provide the coverage needed and/or meet the requirements of the Town of Bedford Code.

114. The second communication was the memorandum dated January 24, 2018 from the Town of Bedford Police Department ("Bedford Police Memo").

115. The Bedford Police Memo stated:

The Police Department cellular telephones and mobile computers currently use Verizon Wireless for cellular service. Often in the Bedford Village Hamlet area (and other spots scattered throughout the Town), the cellular signal strength is absent or weak which limits cell phone service and causes officers to lose connection on their mobile computers. Loss of connection hinders officer's access to necessary DMV records and can also prevent communication with dispatch via the computer (which can impact response times or information transfer).  The possibility of Verizon accessing additional towers in the area would improve cellular signal strength and therefore increase public and officer safety.

116. The third communication was the letter dated February 6, 2018 from the Town of Bedford Communications Committee ("BCC").

117. In its February 6, 2018 letter, the BCC stated that the need to remedy the significant gap in cell service coverage is "vital to the health safety and welfare of the Town and its residents to have a reliable functioning wireless communications system which permits emergency wireless 911 services." The BCC concluded that "[w]e respectfully urge you to approve the application that will fix this gap in cell coverage as quickly as possible."

118. At the February 13, 2018 meeting, the Planning Board asked Verizon to consider parkland owned by the Town of Bedford known as Indian Hill Park.

119. The Planning Board has no authority to lease Indian Hill Park or any Town property to Verizon for a wireless facility

120. Counsel to the Planning Board advised the Planning Board that the Cellular Law

prohibited wireless facilities in a town park, like Indian Hill Park, and to permit a wireless facility in Indian Hill Park would require an act of the New York State Legislature to grant alienation approval.

121.    Even though the Planning Board has no authority to lease Indian Hill Park, Verizon investigated the suggestion, and its counsel asked the Planning Board to provide (i) a specific location in Indian Hill Park for Verizon to consider and (ii) a written statement from the Town Board that the Town Board would indeed lease Indian Hill Park to Verizon.

122.    The Town Board never provided any statement that the Town would lease Indian Hill Park to Verizon to construct a wireless facility.

123.    On February 26, 2018, the Planning Director provided Verizon with the Planning Board's suggested location (by latitude and longitude on a Google Earth map) for a wireless facility in Indian Hill Park.

124.    In response, Verizon submitted to the Planning Board a report from C Squared, dated March 19, 2018, with regard to the Indian Hill Park alternative using the Planning Board's location.

125.    C Squared's March 19, 2018 report included coverage maps showing the proposed coverage from Indian Hill Park and these maps demonstrated that Indian Hill Park provided very little of the coverage that the Hickory Lane Facility would provide.

126.    C Squared's March 19, 2018 report also explained why distributed antenna systems (DAS), a technology which uses existing utility poles in the right of way, is not a feasible alternative to the Hickory Lane Facility due to the topography, vegetation and overall size of the gap, and why boosters are not a feasible alternative to the Hickory Lane Facility.

127.    Verizon also submitted to the Planning Board a letter, dated March 19, 2018, signed and sealed by Antonio Gualtieri of Tectonic, a New York State Licensed Professional Engineer, confirming that there would be no need to widen the existing access way from the Hickory Lane

21

Property to Hickory Lane, since the existing "access way is wide enough to accommodate the equipment need to construct the Facility, including the crane."

128. On April 23, 2018, Mr. Graiff responded to C Squared's March 19, 2018 report.

129. Mr. Graiff made the following findings in his April 23, 2018 report:

FINDING: With the evidence provided as well as the opinion of the undersigned the Town Park Alternate site (referring to Indian Hill Park) is much too far to the north and west of the previously demonstrated gap, the Town Park Alternate site is not suitable to provide the relief Verizon Wireless seeks.

FINDING: DAS is not a practical alternate to the macro site proposed.

FINDING: Alternate technologies discussed are not practical alternatives to the macro site proposed.

130. Mr. Graiff further stated that C Squared's "estimate of nearly 240 nodes being required to provide the coverage needed, from this engineer's experience, is a reasonable conclusion."

131. At the April 24, 2018 meeting, the Planning Board acknowledged Mr. Graiff's latest report, admitted that better cell service was needed in the subject area, and discussed Verizon's balloon test. The Planning Board Chair stated that "I had a very hard time seeing the balloon from Bedford Village" and also stated that "it is a distant view over our national registered Historic District of Bedford Village."

132. On June 18, 2018, the Planning Board conducted another public hearing regarding the Hickory Lane Application.

133. Prior to the June 18, 2018 public hearing, Verizon agreed to lower the height of the tower to 130 feet and to camouflage the tower as a stealth tree pole. Verizon submitted various materials regarding the project including among other things: (a ) revised Zoning Drawings showing a reduced fenced compound and that only 14 trees required removal to accommodate the Hickory Lane Facility; (b) Tectonic's detailed response to the only comments regarding the Hickory Lane

Application from Hahn Engineering, the Town engineer, dated March 26, 2018, which required structural calculations regarding the tower (notwithstanding that such calculations are typically required during the building permit stage); (c) an appraisal report, dated May 8, 2018 from Lane Appraisals finding that the Hickory Lane Facility will not decrease property values based upon actual sales data of homes near similar facilities; and (d) a report from C Squared, dated June 18, 2018 detailing that Indian Hill Park and other alternatives sites were considered alone or in combination and finding that "no combination of any or even all these alternates can provide the coverage necessary to remedy the significant coverage gap that the facility at the proposed Site will remedy."

134.    A number of residents testified at the June 18, 2018 public hearing in favor of the Hickory Lane Facility and the critical need for service, particularly in the Bedford Village Historic District (which is about one mile away from the Hickory Lane Facility) and Mianus River Gorge.

135.    The Bedford Historical Society submitted a letter to the Planning Board, dated June 13, 2018, urging a denial of the Hickory Lane Application.  The letter mischaracterized the extent of the visibility of the Hickory Lane Facility by alleging that "[h]owever distant it may be geographically, the tower would be seen above the treeline and the top of the tower would be visible from various places around the Village Green, our most historic landmark."

136.    The Bedford Historical Society also sent out a notice to all residents which claimed that "[t]here are numerous alternatives, albeit more expensive, that would have minimal impact on the Village and surrounding area."

137.    When Verizon asked for alternatives from the Bedford Historical Society, the Bedford Historical Society never responded.

138.    In response to the Bedford Historical Society's allegations, SHPO notified the Planning Director via email that on June 19, 2018 (the day following the June 18, 2018 hearing)

SHPO sought to reopen the Section 106 process and review the impacts on the historic resources anew.

139. In response to the June 2018 public hearing, Verizon revised the design of the Hickory Lane Facility in two significant ways—by reducing the height of the Hickory Lane Facility to 115 feet and by changing the design of the Hickory Lane Facility to a "slim stick"—a flagless flagpole with antennas inside the pole to be concealed from view.

140. Verizon introduced the redesigned Hickory Lane Facility at the September 17, 2018 Planning Board meeting and filed an updated submittal, dated September 7, 2018, with all of the application requirements.

141. Verizon's submittal included revised Zoning Drawings. The revised Zoning Drawings showed: (a) the slender profile of the slim stick pole, a stealth design with all antennas concealed inside the pole; (b) the reduced fenced compound of 1,995 square feet (being only 35 feet by 57 feet); (c) the small number of trees (namely 14 trees) requiring removal from the 17 acre wooded Hickory Lane Property to accommodate the Hickory Lane Facility; (d) the existing access way from the Hickory Lane Property to the Hickory Lane remaining unchanged; and (e) the location of the only two homes within 500 feet from the Hickory Lane Facility, with the closer of the two homes being 425 feet away.

142. Verizon's submittal contained an updated visual resource evaluation regarding the redesigned Hickory Lane Facility prepared by Tectonic based upon a second balloon test that Tectonic performed at the new reduced height.

143. Verizon's submittal enclosed a revised full environmental assessment form ("EAF") prepared by Tectonic, and a Part III of the EAF prepared by VHB, Verizon's planning consultant, demonstrating that the Hickory Lane Facility would not have any adverse impact on aesthetic

24

resources, historic and archaeologic resources, or community character.

144.   Verizon's submittal also provided another report from C Squared, dated September 6, 2018, with (a) drop call data showing a drop call rate as high as 24% (almost 1 of every 4 calls) in the subject area; (b) propagation maps and other documentation showing that there are no suitable existing structures or alternatives that can remedy Verizon Wireless' significant coverage gap and that ten (10) alternative locations plus the only three non-residential zoning districts "even remotely near… the significant gap in coverage" were considered and would not provide the necessary coverage and/or are not feasible; and (c) propagation maps demonstrating that the Hickory Lane Facility will remedy the gap which includes major roadways such as Pound Ridge Road (NYS Route 172), Long Ridge Road (County Highway 3), Middle Patent Road and Mianus River Road— including over 2,000 people and over 100 businesses.

145.   At the September 17, 2018 meeting, the Planning Board insisted that another balloon test be performed when leaves are off the trees.  The Planning Board also asked to be involved with the protocol for the balloon test.

146.   Even though Mr. Graiff, the Town's wireless consultant, had already stated in his letter, dated December 26, 2017 that "Verizon Wireless has demonstrated that there exists a significant gap in coverage in the area for which it seeks relief," the Planning Board demanded that Verizon provide an irrelevant "search ring" that Verizon used for locating the Hickory Lane Facility.

147.   In response, Verizon submitted Verizon's "Coverage Objective Sheet." The Coverage Objective Sheet provided coordinates for a "Search Area Center."

148.   The Search Area Center is where the wireless facility should be placed in order to meet the coverage objective and remedy the gap.

149.   The Search Area Center shown on the Coverage Objective Sheet is adjacent to the

Hickory Lane Property, thereby further confirming that the Hickory Lane Facility is necessary and will remedy the gap in coverage.

150. At the November 13, 2018 meeting, the Planning Board discussed the photo locations for the balloon test, requiring even more locations than the prior test and reviewed the protocol for the test with Verizon's visual consultant, Matthew Allen of Saratoga Associates.

151. The Planning Board also discussed Section 106 review with Verizon's historical and environmental consultant, Kaitlin Abrams of Trileaf.

152. In response to the Planning Board's concern that the Mianus River Gorge is a natural landmark and may require Section 106 review, Trileaf confirmed that the Mianus River Gorge is not a "historic property" as defined under Section 106 of the National Historic Preservation Act and not subject to Section 106 review.

153. At its December 11, 2018 meeting, the Planning Board scheduled the balloon test for January 12, 2019 and confirmed that Saratoga Associates would use the new photo location list prepared by the Planning Director, for the balloon test.

154. As requested, Matthew Allen of Saratoga Associates detailed in writing the balloon test protocol agreed to by the Planning Board. The approved protocol included the size and color of the balloons to be used; the heights to which the balloons will be raised (115 feet consistent with the redesigned Hickory Lane Facility and 130 feet as requested by the Planning Board); and even the type of camera and lens to be used.

155. Verizon submitted to the Planning Board the results of the balloon test in the Visual Resource Assessment ("VRA") prepared by Saratoga Associates and dated April 2019.

156. The VRA contained an assessment of the Hickory Lane Facility from vantage points and resources in the surrounding area, including photos and visual simulations of the slim stick in full

26

"leaf off" (winter) conditions.

157.    During the balloon test, Saratoga Associates went to 62 locations and from nearly all of them, the balloon was either not visible at all or vegetative screening filtered the view.

158.    The VRA demonstrated that the potential visibility and impacts from the Hickory Lane Facility would be *de minimus*.  First, there were no large geographic areas from which the balloon (and hence the Hickory Lane Facility) could even be seen.  Second, the Hickory Lane Facility was significantly screened by distance, intervening topography and heavily wooded vegetation even during "leaf-off" (winter) conditions.  Third, in those limited instances where it could be viewed, the Hickory Lane Facility, with its slim stick design, would blend in with the visual characteristics of the landscape and would not have any adverse effect on visual resources or the surrounding area.

159.    The VRA concluded that the Hickory Lane Facility "will have no adverse visual and aesthetic impact to the area" and was consistent with SHPO's review of the redesigned Hickory Lane Facility which found that the "stick" design at 115 feet would have "No Adverse Effect on the National Register listed Bedford Village Historic District."

160.    Despite agreeing to the protocol and providing the photo locations, the Planning Board at its June 24, 2019 meeting and in a letter, dated July 12, 2019, insisted that the Verizon have Saratoga Associates, among other things, (a) provide photos from additional locations; (b) furnish simulations from photos not taken by Saratoga Associates at the balloon test; (c) redo simulations that Saratoga Associates performed; and (d) provide the Planning Board a copy of Trileaf's submission to SHPO.

161.    Verizon provided all of the additional information on August 19, 2019, notwithstanding that none of these requirements are in the Cellular Law or otherwise required by the Town Code.

27

162.    At its September 24, 2019 meeting, the Planning Board declared the visual analysis complete, although it still oddly requested information about the glass in the lens used by Saratoga Associates and an academic citation for the premise that the photos must be held at a certain distance to replicate what the naked eye will see.

163.    In addition to Verizon responding on May 10, 2019 to the Planning Board's requests with respect to the VRA and all of the additional photographic simulations and analyses, Verizon furnished another report from C Squared on that date in response to the Planning Board' s request for a summary of all alternatives that Verizon Wireless had considered.

164.    C Squared's May 7, 2019 report provided a compendium of the seventeen (17) alternatives it had reviewed as well as analysis of why none of those alternatives were feasible for purposes of remedying the coverage gap.

165.    C Squared's May 7, 2019 report further highlighted that the Hickory Lane Facility "will provide much needed coverage into the Historic Bedford Village area of Town" and "the majority (approximately 60%) of the coverage from the Facility will be in the Town of Bedford, with the remainder split between Pound Ridge (approximately 25%) and North Castle (approximately 15%)."

166.    Verizon also submitted on May 10, 2019 a letter from Lane Appraisals, dated April 26, 2019, documenting the irregularities in the appraisals prepared by other appraisers hired by opponents and the Town.

167.    On October 16, 2019, Verizon received a letter from the Planning Board's second wireless consultant, The Center of Municipal Solutions ("CMS") requesting additional propagation maps showing all of the frequencies that Verizon would be utilizing.

168.    This request was not consistent with the Cellular Law.  In fact, Verizon had already

submitted at the request of Mr. Graiff, the Planning Board's first wireless consultant, propagation maps using the lowest frequency Verizon would be utilizing in order to show the best case scenario of existing coverage.

169.    At the October 29, 2019 hearing, Nancy Steiner, a neighbor living at 1 Twin Lakes Drive in close proximity to the Hickory Lane Property, testified in favor of the Hickory Lane Application and submitted a letter, dated October 29, 2019.  She explained in the letter that she had a serious illness and if "I had had to rely on the cell service at my house, I would not be alive." She also stated that cell service is necessary to receive and make "calls to and from our families, doctors, care givers, or even the electric company during a storm."

170.    On November 15, 2019, Verizon provided the following additional documentation to the Planning Board: (a) a report from C Squared, dated November 15, 2019, with the additional coverage maps requested by CMS which further demonstrated that (i) Verizon Wireless has a significant gap in coverage; (ii) the Hickory Lane Facility will remedy that significant gap in coverage; (iii) the Hickory Lane Facility as a 115-foot tall slim stick is at the minimum height to provide the necessary coverage; and (iv) the Hickory Lane Facility will provide coverage to 10.44 square miles of area which includes 1.3 miles on Pound Ridge Road (Route 172), 1.7 miles on Long Ridge Road (County Highway 3), 0.9 miles on Middle Patent Road and 2.1 miles on Mianus River Road, including over 2,600 people and 200 businesses; and (b) a drawing and letter prepared by Tectonic, dated November 14, 2019, detailing the ability of all emergency services to access the Hickory Lane Facility.

171.    Tectonic's letter, dated November 14, 2019 attached an e-mail from Fire Chief Carmody of the Bedford Fire Department, dated November 13, 2019, to the Planning Board.  The email stated that "The BFD has verified through engineering design plans that the largest fire

apparatus that the BDF may need on the site will be able to access the site, operate and make a three-point turn out of the site."

172. In addition, Verizon submitted to the Planning Board a letter from Saratoga Associates, dated November 22, 2019 responding to comments that Tristan Pope, the son of a neighbor and a purported photographer made regarding the VRA.

173. Saratoga Associates explained in its letter, dated November 22, 2019, that visual resource assessments like the VRA here "are a commonplace tool utilized by the local and state governments, the federal government, as well as individuals, small businesses and multinational corporations, to depict the appearance of a proposed project. Visual resource assessments are regularly employed for projects as small as a single wireless telecommunications facility and as large as a wind energy farm comprised of numerous wind turbines covering dozens of square miles. The continued use of visual resource assessments, like the VRA performed here, confirms the value of the assessment."

174. On December 16, 2019, CMS submitted a letter to the Planning Board which found "Verizon has service needs within the Town of Bedford" and suggested only one alternative to the Hickory Lane Facility, recommending that Verizon reconsider the town-owned park known as Indian Hill Park.

175. In response, C Squared submitted a supplemental letter dated January 7, 2020 which (a) demonstrated with coverage maps that the Indian Hill Park site would provide very little of the coverage that the Hickory Lane Facility would provide, and (b) documented that 2,681 people and 201 businesses would benefit from the Hickory Lane Facility.

176. For over a year, from January 7, 2020 to February 22, 2021, the Planning Board held the Hickory Lane Application in abeyance so that the Stone Hill Application (as discussed below)

30

could be reviewed.

177.    On March 3, 2021, Verizon submitted a letter from AT&T, dated February 28, 2021 ("AT&T Letter"), to the Planning Board, which fully supported the Hickory Lane Application and in which AT&T agreed to collocate on the Hickory Lane Facility for its own benefit as well as AT&T's emergency responder network known as "FirstNet."

178.    The AT&T Letter to the Planning Board states:

AT&T has a significant coverage need which has been identified by AT&T's Radio Frequency Engineers in and around 91 Hickory Lane. AT&T's collocation on the proposed facility at 91 Hickory Lane at 90 feet and 80 feet would resolve the coverage gap that would allow for seamless coverage of the many telecommunication services provided by AT&T to its transient customers, but more importantly, AT&T's customers living in the area.

179.    On March 3, 2021, Verizon also submitted the following items: (a) annotated maps from C Squared showing the coverage from the Hickory Lane Facility and showing that the Hickory Lane Facility will provide coverage to Bedford Village, Mianus River Gorge, and other areas requested by the Planning Board namely Bedford Village Elementary School, Hunting Ridge Mall and the Farms neighborhood, and (b) a letter dated March 2, 2021 from Tectonic certifying that (i) only 14 trees need to be removed for the Hickory Lane Facility, (ii) there are only 2 homes within 500 feet, (iii) the diameter of the slim stick (being 4.6 feet at the bottom and tapering to only 3.5 feet a top) is less than the 5 feet diameter of the red balloon using during the balloon test, and (iv) the Hickory Lane Property does not contain any hydric soils, is not located on any aquifer, and is located outside of the NYC Watershed Boundary.

180.    On March 8, 2021, the Planning Board closed the public hearing. However, it allowed for additional written comments to be submitted although no additional verbal testimony would be permitted.

181.    On March 12, 2021, Verizon submitted (a) a letter from C Squared, dated March 11,

31

2021, with coverage maps documenting that two rooftop sites just suggested by the Planning Board at its March 8, 2021 hearing (namely the Bedford Playhouse located in the nationally recognized Bedford Historic District and the Hunting Ridge Mall) are not feasible alternatives to the Hickory Lane Facility and repeating the finding set forth in C Squared's prior reports that "the Hickory Lane Facility will provide coverage to 10.44 square miles of area which includes 1.3 miles on Pound Ridge Road (Route 172), 1.7 miles on Long Ridge Road (County Highway 3), 0.9 miles on Middle Patent Road and 2.1 miles on Mianus River Road) including 2,618 people and 201 businesses;" and (b) photographs of existing slim stick facilities from several residential neighborhoods in Westchester County.

182. On March 19, 2021, Verizon submitted a letter from Saratoga Associates, dated March 18, 2021, explaining why the zoomed images and simulations that the Planning Board Chair presented for the first time at the March 15, 2021 work session are not a fair representation of the Hickory Lane Facility.

183. On March 22, 2021, Cityscape Consultants Inc. ("CityScape"), the Planning Board's third wireless consultant, issued a report ("CityScape Report") for review at the March 22, 2021 Planning Board work session.

184. The CityScape Report specifically made the following statements:

(a) Verizon Wireless described they had significant coverage gap in the Bedford Village area.
(b) That is the premise for a new facility and there is no disagreement that a coverage gap does exist.
(c) We cannot opine on which option would be more desirable to Bedford, but both options (referring to the Hickory Lane Facility and the Stone Hill Facility) appear to remedy the purported designated coverage gap.
(d) The small cells can provide greater signal penetration in parts and portions of the designated areas but not widely available coverage regardless of the frequency because the total antenna elevation is too low.

185. On March 26, 2021, Verizon submitted a response to the CityScape Report and to the

updated reports from an appraiser retained by the Town presented at the March 22, 2021 work session, with a report from C Squared, dated March 26, 2021 and a letter from Lane Appraisals, dated March 25, 2021.

186. C Squared's March 26, 2021 report refuted CityScape's analysis regarding the coverage from Indian Hill Park by documenting that the elevations for the Indian Hill Park used by CityScape were incorrect.

187. C Squared further explained that, as it had irrefutably proven in its prior reports, a facility at Indian Hill Park will leave gaps in coverage in the southeastern portion of the Town. In contrast, the Hickory Lane Facility will remedy the entire gap in coverage in the southeastern portion of the Town.

188. C Squared further concluded that:

1. The Hickory Lane Site will provide coverage to the entire southeastern corner of the Town of Bedford (including the Bedford Village Area, Pound Ridge Road (Route 172), Long Ridge Road (County Highway 3), Middle Patent Road, and Mianus River Road.)
2. While the Indian Hill site will provide some coverage to an area further to the north, the Indian Hill site will not provide coverage to the entire gap to the north and will not provide coverage to the entire gap that exists in the southeastern portion of the Town.

189. C Squared's finding are in fact consistent with Mr. Graiff's April 23, 2018 report that stated:

The Town Park Alternate site (referring to Indian Hill Park) is much too far to the north and west of the previously demonstrated gap, the Town Park Alternate site is not suitable to provide the relief Verizon Wireless seeks.

190. C Squared also provided in its March 26, 2021 report a combined alternatives map identifying the more than twenty-five (25) alternative sites that had been considered.

191. Lane Appraisals' March 25, 2021 letter detailed that the updated appraisal reports from the appraiser retained by the Town lacked any data to support its conclusions and failed to

account for the change in design from a monopole to a slim stick and for the change in height from 150 feet to 115 feet.

192.    On the Sunday before the March 29, 2021 final meeting of the Planning Board, various unlabeled maps ("Ex Parte CityScape Maps") allegedly prepared by CityScape and stamped received by the Planning Board on March 28, 2021appeared on the Planning Board's website.

193.    The Ex Parte CityScape Maps were introduced after the close of the administrative record by the Planning Board.

194.    The Ex Parte CityScape Maps purported to show coverage at 50 feet and 80 feet from a proposed pole on Indian Hill Road.

195.    On March 29, 2021, Verizon responded to the Ex Parte CityScape Maps by submitting a map from C Squared which demonstrated that an 80 foot pole at Indian Hill Road would not remedy the gap in service, resulting in a gap in service on Long Ridge Road (County Route 3), with a letter stating that (a) there are at least 5 homes within 500 feet from the Indian Hill Road pole (with one home being only approximately 112 feet away) and (b) the ground equipment to support the operation of antennas on the Indian Hill Road pole would have to be in the right of way, approximately 19 feet from the pavement. Thus, the pole would be readily visible to the traveling public along Indian Hill Road.

196.    On March 29, 2021, the Planning Board did not allow Verizon to speak at the meeting. Rather, the Planning Board read the Denial Resolution and verbally voted to deny both the Hickory Lane Application and Stone Hill Application as discussed below.

The Stone Hill Application and Other Alternatives Suggested by the Planning Board

197.    On January 2, 2020, the Planning Board's counsel e-mailed Verizon's counsel requesting that Verizon consider a site known as "Coker Farm" located at 69 Stone Hill Road ("Coker

34

Farm Property").

198.    The e-mail stated: "There is at least one additional site which we would like your client to look at.  It is called Coker Farm.  We understand that the owner is willing to locate a cell tower on its property.  We have also asked the Town's consultant to look at the site. Jeff (referring to the Planning Director) will send you a location map."

199.    On January 6, 2020, the Planning Director sent an e-mail to Verizon's counsel with the location map.

200.    The Planning Director organized a site visit of the Coker Farm Property for January 7, 2020, the same day as the Planning Board meeting.

201.    The site visit was attended by Verizon personnel, Verizon's counsel, and Verizon's engineer, Tectonic, and the Planning Director suggested two alternative locations for a wireless facility on the Coker Farm Property.

202.    At that same site visit, the Planning Director conceded that using Indian Hill Park for a wireless facility would be difficult, particularly due to the need to construct a long driveway near homes to provide access to the passive parkland.

203.    At its January 7, 2020 meeting, the Planning Board discussed the site visit at the Coker Farm Property earlier that day and also explained that the property across the street, the Stone Hill Property at 68 Stone Hill Road, has the same willing owner.

204.    In fact, the Planning Director at the January 7, 2020 meeting stated that "it would be good to know on the record why that alternative you decided not to use, because we don't understand, the one across the street" referring to the Stone Hill Property.

205.    The Planning Board Chair also referred Verizon to the Stone Hill Property at the January 7, 2020 meeting, stating "that still is an alternative . . . the owner of that property is the same

35

as the owner of Coker Farms and she is willing to have that property considered as well."

206.   Based upon that direction given by the Planning Board and the Planning Director on January 7, 2020, Verizon turned to evaluating the feasibility of placing the wireless communication facility on the Coker Farm Property, and the Stone Hill Property which is across the street from the Coker Farm Property.

207.   The Coker Farm Property turned out to be unusable since it has a recorded conservation easement which prohibits use of the property.

208.   The Stone Hill Property became the primary candidate and Verizon entered into to a lease and commenced engineering, regulatory and environmental review of the Stone Hill Property.

209.   On September 9, 2020, Verizon filed a complete Special Permit and site plan application for the Stone Hill Facility on the Stone Hill Property with the Planning Board.

210.   The filing for the Stone Hill Facility included the following: (a) Special Permit Application Form; (b) Preliminary Site Plan Application Form; (c) Environmental Clearance Form; (d) Memorandum in Support of Application with (i) RF Justification Report from C Squared, (ii) RF Exposure Report from EBI Consulting; (iii) Full Environmental Assessment Form ("EAF"); (iv) Verizon's FCC licenses; (v) Memorandum of Lease; (vi) Structural Certification from Tectonic; (vii) Simulations of the Stone Hill Facility prepared by Saratoga Associates; and (viii) Site Plan.

211.   At its September 22, 2020 and October 13, 2020 meetings, the Planning Board reviewed the Stone Hill Application.

212.   Neighbors opposed the Stone Hill Facility based on "health effects" and other factors.

213.   The Planning Board received an updated letter from CMS regarding the Stone Hill Facility, dated October 13, 2020 ("CMS Update").

214.   The CMS Update stated:

The new alternate location is within the area identified by Verizon where service is deficient. Proof of need for this area has been established by prior submissions of RF data and propagation maps submitted with this application. The alternative location with a proposed structure of 150' would allow Verizon to achieve their service needs as well as accommodate colocation of up to three (3) additional service providers at this location.

215.    Verizon requested by letter, dated November 3, 2020, that the Planning Board schedule the visual test demanded by the Planning Board to assess the potential visual impact of the Stone Hill Facility.

216.    In accordance with the Planning Board's demand, the visual test consisted of a bucket lift being placed at 150 feet, the height of the Stone Hill Facility, and photographs being taken at locations within the vicinity.

217.    On November 3, 2020, Verizon also submitted a revised Site Plan and a survey.

218.    In response to Planning Board comments, the revised Site Plan showed increased setbacks from the street for the Stone Hill Facility and also demonstrated that the Stone Hill Facility avoided all wetland buffers.  The survey documented that the Stone Hill Property had access to Stone Hill Road, a New York State road.

219.    At its November 10, 2020 meeting, the Planning Board scheduled Verizon's bucket lift test for December 12, 2020, and subsequently provided Verizon with 36 viewpoints for evaluating the visibility of the Stone Hill Facility.

220.    On January 15, 2021, Verizon submitted the following additional documentation to the Planning Board in connection with the Stone Hill Road Facility: (a) a visual analysis report ("VAR") from FC Architects; (b) a SHPO 106 Approval for the Stone Hill Facility noting No Historic Properties in the Area of Potential Effects; (c) an email from DEC that herons are not a listed and endangered species in response to concerns about an alleged heron rookery nearby; and (d) a photo of a barn type façade structure blocking the ground equipment at an existing wireless facility as an

37

option for ground equipment screening.

221.    The VAR documented that of the 36 locations set forth by the Planning Board, the Stone Hill Facility would not be visible at all from 27 locations. Of the 9 locations where the Stone Hill Facility would be visible, 2 were on the landlord's property and the remaining 7 were largely screened by the vegetation even during leaf-off conditions.

222.    At its January 20, 2021 meeting, the Planning Board noted that the applicant's visual impact analysis was accurate.

223.    The Planning Board and Verizon mutually agreed to extend the FCC shot clock to March 31, 2021 for a decision on the Stone Hill Application and the Hickory Lane Application.

224.    Rather than continue to discuss the Stone Hill Application, the Planning Board directed its attention to Indian Hill Park, even though no application for a facility at Indian Hill Park was before the Planning Board and the Town Board had not agreed to lease space at Indian Hill Park nor pursue State Legislation to alienate the parkland as required by the New York State Constitution.

225.    The Planning Board held its own balloon test for Indian Hill Park, and the Planning Board's meetings of January 25, 2021 and February 8, 2021 were devoted to Indian Hill Park, as an alternate site for a communications tower, and other alternatives.

226.    Numerous residents expressed their objection to a communications tower at Indian Hill Park and formed a group called the Indian Hill Park Conservancy ("Park Opponents") to oppose the use of the Indian Hill Park.

227.    The Park Opponents criticized the Planning Board's balloon test to such an extent that the Planning Board conceded at its February 8, 2021 meeting that another balloon test would be needed.

228.    The Park Opponents retained their own wireless consultant, Gunnerson Consulting &

Communications Site Services ("Gunnerson") to provide alternatives to the use of Indian Hill Park for a tower.

229. Gunnerson's presentation to the Planning Board on January 25, 2021 and accompanying report, dated January 25, 2021 (collectively, the "Gunnerson Report") suggested using up to 4 poles in the right of way for each FCC licensed carrier to provide coverage to the existing significant gap.

230. The Gunnerson Report estimated that at least 24 poles with a minimum height of 50 feet each would be required to meet the needs of all wireless carriers and emergency services.

231. The Gunnerson Report also suggested that an 80-foot tall tower at the water tank located to the west of the Bedford Village Historic District and a 100-foot tall tower in the transmission line run to the northeast of the Bedford Village Historic District should be considered.

232. In response, the Planning Board stated at its January 25, 2021 meeting that (i) the 80-foot tower at the water tank was a place that the Town wireless committee "looked at and decided it was a problem visually because of Sunnyfield Farm," and (ii) the 100-foot tower in the transmission line area would not work because the local utility operating the transmission lines, NYSEG, "will not agree to it, we've tried."

233. In response to the Gunnerson Report, Verizon submitted a report from C Squared, dated February 12, 2021.

234. C Squared's report demonstrated that due to the heights of the existing mature trees in the Town exceeding 50 feet, the signal from the 50-foot poles suggested by Gunnerson will be blocked so that the 50-foot poles "are not a feasible option to remedy the gap in coverage."

235. The C Squared report also highlighted other fatal flaws in the Gunnerson Report such as the fact that (a) the 50-foot poles would not have emergency backup power to withstand prolonged

power outages and such emergency power is required under Section 125-85.2 Z.(6)(d) of the Town Code; and (b) the ground equipment supporting the 50-foot poles could not be buried on the side of the road due to bedrock.

236.    On March 4, 2021, Gunnerson submitted another report to the Planning Board supporting the Hickory Lane Facility stating that the "Hickory Lane site is the only site that fills Verizon's identified gap in coverage" and "the visual impact of a 115' slim pole at Hickory Lane will be far less than portrayed by opponents and far less visually intrusive than a tower at Indian Hill Park."

237.    At the March 8, 2021 Planning Board meeting, Chief Mann of the Ramapough Lenape Nation spoke of the history of the 1644 massacre of Native Americans that may have taken place at Indian Hill Park.

238.    The Planning Board acknowledged that Indian Hill Park could not even be considered as an alternative site for a wireless facility "until the Ramapough have had the opportunity to study and to decide what the relationship between that property and the truly horrific events of 1644 is."

239.    To date, no study has been undertaken to determine whether the 1644 massacre occurred at Indian Hill Park.

The Denial Resolution

240.    At the March 29, 2021 meeting, the Planning Board unanimously denied the Hickory Lane Application and the Stone Hill Application, adopting the Denial Resolution and filing it on March 31, 2021.

241.    Notwithstanding the Planning Board declaring itself lead agency pursuant to Article 8 of New York State's Environmental Conservation Law better known as SEQRA on February 13, 2018, the Planning Board failed to render an environmental Determination of Significance under

40

SEQRA during its review of either application.

242. The Planning Board failed to properly evaluate the applications in accordance with the Town Code criteria.

243. The Planning Board improperly relied upon the "Purposes" section of the Cellular Law and Wireless Law as Special Permit criteria under the Code, notwithstanding that those provisions are not substantive requirements under the Town Code.

244. The Hickory Lane Facility and the Stone Hill Facility meet the general and specific Special Permit and site plan criteria set forth in the Town Code, including the Cellular Law and the Wireless Law, as applicable.

245. The Denial Resolution is littered with factual and legal inaccuracies including misstatements about the extent of the coverage that the Hickory Lane Facility will provide; the amount of coverage that will be provided to the neighboring Town of Pound Ridge; the significance of the service that the Facilities would provide to the Bedford Police; and the availability of the Hickory Lane Facility for collocation.

246. In the Denial Resolution, the Planning Board alleges without any support whatsoever that approval of the Hickory Lane Facility will "adversely affect the public health, safety and general welfare by undermining and prolonging the town's efforts to find a comprehensive solution to Bedford's cell service and capacity problems" as a reason for the Planning Board's denial.

247. The record is uncontradicted that the Hickory Lane Facility will provide a comprehensive solution for Verizon to cover the southeastern portion of the Town.

248. The record is devoid of any evidence that approving the Hickory Lane Facility would impede any alleged Town effort to finding a comprehensive solution to its cell service problems (a solution which had still not even been presented at the time of the Planning Board's Denial

Resolution).

249.   In the Denial Resolution, the Planning Board improperly relies on the lack of "an integrated solution to the Town's cell service issues" being issued by Town's Wireless Facilities Working Group ("WFWG") as a reason for the denial, alleging without any factual basis whatsoever in the written administrative record that the "Hickory Lane installation will negate much of the work that the WFWG has spent over the last two years, since a new tower in this location changes the variables."

250.   There is no Special Permit criteria or other Town Code requirement that the location of wireless facilities shall be consistent with any supposed Town group effort to locate towers in the Town.

251.   In the Denial Resolution, the Planning Board alleges that a reason for its denial is that "much of the area served by the Hickory Lane site is located in neighboring Pound Ridge" and as such, it would do little to assist the Bedford Police in improving their communications problems.

252.   The area of coverage in a neighboring municipality is not a Special Permit criteria or other Town Code requirement.

253.   The record is uncontradicted that the Hickory Lane Facility primarily services Bedford with only 25% of its coverage in neighboring Pound Ridge. Further, the Hickory Lane Facility will serve the Bedford Village area, the area that the Bedford Police explicitly stated in the Bedford Police Memo needed coverage for public safety.

254.   In the Denial Resolution, the Planning Board alleges that "three existing residences are located within five hundred feet of the proposed tower," and "use of these sites will also be hindered as a result of the placement of the proposed tower."

255.   The record shows that there are only two homes within five hundred feet of the

Hickory Lane Facility, and there is nothing more than speculation to support the Planning Board's allegation that the use of the neighboring sites will be hindered by the Hickory Lane Facility, which is proposed in a small portion of the over 17 acre Hickory Lane Property and which is in compliance with all setback requirements.

256.    The Planning Board's rationale for denial based upon the Hickory Lane Facility's distance to homes is an illegal pretext for regulating the placement of wireless service facilities on the basis of the environmental effects of radio frequency emissions in violation of the Telecommunications Act.

257.    In the Denial Resolution, the Planning Board alleges that Verizon may have to widen the existing driveway and claims the alleged driveway widening will impact orderly development of the area and affect public safety.

258.    The record, including letters from Tectonic, affirmatively establishes that the existing driveway will not need to be widened and that the Hickory Lane Facility is unmanned so it will not create any traffic impact.

259.    In the Denial Resolution, the Planning Board specifically finds:

Operations in connection with any special permit use will not be more objectionable to nearby properties by reason of noise, fumes, vibration, light, or other characteristics than might be the operations of any permitted use not requiring a special permit.  The application is in compliance with this provision because:
1.The placement of the tower is not anticipated to result in uses that will be more objectionable to nearby properties by reason of noise, fumes, vibration, light or other characteristics than might be the operations of any permitted uses not requiring a special use permit.

260.    By making the foregoing finding, the Planning Board admits and acknowledges that the Hickory Lane Facility is not more objectionable than other permitted uses.

261.    If the Hickory Lane Facility is not more objectionable than other permitted uses, then the Hickory Lane Facility, *ipso facto*, is in keeping with the community character and development

of the area.

262.    In the Denial Resolution, the Planning Board further states that:

As proposed in the applicant's site plan, parking areas will be of adequate size for the particular use, properly located and suitably screened from adjoining residential uses; and the entrance and exit drives shall be laid out so as to achieve adequate safety.

263.    By making the aforesaid statement, the Planning Board admits that the layout of the parking area and access drive for the Hickory Lane Facility is in accordance with the Town Code and accordingly will have no adverse effect on the safety of adjoining properties.

264.    In the Denial Resolution, the Planning Board claims that Verizon has not properly addressed the Hickory Lane Facility's impacts on viewsheds, scenic features and historic sites and structures, as a reason for the denial.

265.    The record, however contains (a) SHPO's approval of the Hickory Lane Facility, finding that the Hickory Lane Facility will have no adverse effect on historic sites and structures, and (b) the VRA, a commonly used tool, clearly demonstrating that the Hickory Lane Facility would have no adverse impact on viewsheds and scenic features due to the heavily wooded vegetation, the topography, the distance and the slim features of the Hickory Lane Facility.

266.    In the Denial Resolution, the Planning Board alleges a reason for the denial is that "Verizon has not demonstrated that collocation on the proposed facility is possible."

267.    In direct contravention of the Planning Board's contention, the record contains the AT&T Letter which clearly states AT&T's willingness to collocate on the Hickory Lane Facility.

268.    In the Denial Resolution, the Planning Board alleges that "Verizon has not provided a plan which minimizes the number of facilities within the Town of Bedford."

269.    Verizon is only proposing one tower to fulfill its gap in coverage in this portion of the Town, and with the Hickory Lane Facility, only that tower would be needed to cover the entire

southeastern portion of the Town, thereby minimizing the number of facilities in the Town.

270.    The record is uncontradicted that there is a significant gap in Verizon's reliable wireless coverage, and the Denial Resolution even states that the "Town of Bedford has acknowledged the existence of a substantial gap in service in the Bedford Village area for quite some time."

271.    The record is uncontradicted that Verizon investigated every conceivable alternative including every alternative suggested by the Planning Board in order to remedy the existing gap in service.

272.    The record is uncontradicted that there are no feasible alternatives other than the Hickory Lane Facility and the Stone Hill Facility to remedy the significant gap.

273.    Even the Planning Board's own wireless consultant, CityScape, in the CityScape Report found that the Hickory Lane Facility and the Stone Hill Facility would remedy the coverage gap.

274.    Verizon demonstrated that the Hickory Lane Facility, consisting of a 115-foot slim stick with antennas concealed within the pole, and alternatively, the Stone Hill Facility, consisting of a 150-foot stealth tree, are the least intrusive means to remedy the gap.

275.    In the Denial Resolution, the Planning Board falsely alleges as a reason for the denial, that "Verizon was focused on the use of tall towers, and did not fully explore alternative stealth installations, shorter macro cells or multiple site solutions."

276.    The Planning Board refers to the Gunnerson Report as "credible evidence" of the possibility of shorter facilities, as an alternative to the Hickory Lane Facility.

277.    In fact, Verizon demonstrated in the C Squared report, dated February 12, 2021, that the Gunnerson Report was flawed regarding the use of 50-foot poles because Gunnerson failed to

45

account for the mature trees in the area. Given the topography and/or number of mature trees, neither shorter facilities nor small cells (a technology using existing poles and another alternative suggested by the Planning Board) would provide the necessary coverage to the area.

278.    The CityScape Report provided by the Planning Board's third wireless consultant found that "small cells can provide greater signal penetration in parts and portions of the designated areas *but not widely available coverage* regardless of the frequency because the total antenna elevation is too low." Emphasis supplied.

279.    Thus, the Planning Board's own consultant recognized that small cells cannot provide the necessary coverage, and any Town requirement to dictate the type of technology that Verizon should use to provide the necessary service is preempted by federal law.

280.    The record confirms that the "alternative stealth installations, shorter macro cells or multiple site solutions" were not feasible, were not the least intrusive, did not provide the necessary coverage and are therefore not "credible evidence" of a possible alternative solution.

281.    Lastly, in a plainly desperate attempt to allege that there is an alternative site, the Planning Board refers to Indian Hill Park as a "potential alternative" in the Denial Resolution.

282.    Despite the Planning Board having discussed Indian Hill Park since 2018, the Planning Board concedes in the Denial Resolution that it would still need more time to review Indian Hill Park to undertake a "full environmental analysis due to a variety of factors, including the possibility of the presence of Ramapo Indian artifacts and other impediments."

283.    The written record is replete with the many adverse issues surrounding Indian Hill Park. These include, among other things, the need to construct a long access road, the Ramapough Indian objection to the site and the vociferous opposition from the Park Opponents on the use of park property for a wireless facility.

46

284. The Indian Hill Park was never even offered by the Town Board to Verizon as a site for a wireless facility.

285. In order for Verizon to be able to utilize Indian Hill Park, the Town Board would not only have to grant a lease to Verizon but it would also have to obtain alienation of parkland approval from the New York State Legislature.

286. There is nothing in the record that indicates that the Town Board would approve a lease for Indian Hill Park.

287. There is nothing in the record that the New York State Legislature would grant alienation approval to allow the use of Indian Hill Park for other than park purposes.

288. Even if the Town Board and the New York State Legislature were amenable to the use of Indian Hill Park for a wireless facility, any such approvals would take at least two years. Such a lengthy period far exceeds the presumptively reasonable time under the federal shot clock and would be an unreasonable delay in the siting of a wireless facility under the Telecommunications Act.

289. Suggesting in the Denial Resolution that Indian Hill Park is a feasible alternative is just another ploy by the Planning Board to further delay Verizon in providing the necessary service.

<u>Irreparable Injury, Public Interest, and Balance of the Hardships</u>

290. As a result of the Defendants' actions, the Plaintiff has been and will continue to be damaged and irreparably harmed absent the relief requested herein.

291. The harm caused by the Defendants' unlawful actions includes but is not limited to an effective prohibition on Verizon's ability to provide personal wireless service in the Town, and an impairment of Verizon's: (a) ability to provide its customers in the Town with the high-quality, reliable service they need and rightfully expect; (b) ability to compete with other providers of telecommunication services; (c) full use of its existing licenses and business investments; and (d)

goodwill and business reputation.

292. The harm that the Plaintiff has suffered and is suffering from the Defendants' actions is not reasonably susceptible to accurate calculation and cannot be fully and adequately addressed through an award of damages. The Plaintiff has no adequate remedy at law.

293. Moreover, the public interest in promoting competition in the telecommunications arena—the express goal of the Telecommunications Act—has been irreparably harmed and will continue to be irreparably harmed by the Defendants' unlawful actions. The Plaintiff's present and future customers, as well as the public at large, are significantly prejudiced by the Defendants' unlawful conduct.

294. In addition, wireless telecommunications are an important component of public safety and emergency response systems and provide a vital alternative to traditional land lines during times of public crisis. By preventing the Plaintiff from installing equipment needed to provide service, the Defendants' unlawful actions are causing irreparable harm to the public interest via deprivation of reliable emergency communications.

295. In contrast to the immediate and irreparable injury being suffered by the Plaintiff, its customers, and the public interest, the Defendants will suffer no significant injury if the Court issues the requested injunction. Moreover, the Plaintiff has met all of the requirements for the approvals it seeks under controlling local codes, state and federal laws, and/or precedent.

<u>Allegations Supporting Declaratory Relief</u>

296. A present and actual controversy has arisen and now exists between the parties regarding their respective legal rights and duties. The Plaintiff contends that the Defendants' actions are in violation of the Constitution and the Telecommunications Act, and that the Plaintiff is entitled to all of the approvals necessary to proceed with the project. Upon information and belief, the

Defendants deny these allegations.

297.    The Plaintiff and the public have been and will continue to be adversely affected by the Defendants' unlawful acts and any further delay in approval and construction of the Hickory Lane Facility, or in the alternative, the Stone Hill Facility.

298.    Accordingly, declaratory relief is appropriate and necessary to adjudicate the extent of the Plaintiff's rights and the Defendants' duties and authority.

## COUNT I

**Violation of 47 U.S.C. §332(c)(7)(B)(iii)—Denial of the Applications Not Based on Substantial Evidence in the Written Record**

299.    The Plaintiff realleges and incorporates by reference all preceding paragraphs.

300.    Pursuant to 47 U.S.C. §332(c)(7)(B)(iii), "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

301.    The applications filed by the Plaintiff in support of the Facilities satisfied the criteria specified in the Town Code.

302.    The Planning Board's decision to deny the applications to construct the Facilities as set forth in the Denial Resolution is inconsistent with the criteria specified in the Town Code and under federal and State law.

303.    The Planning Board's decision eschews the actual factual evidence in the written record and rests instead on legal arguments and standards having no bearing on whether the Plaintiff's applications complied with Town Code and warranted the issuance of the requested approvals.

304.    There is no credible, legally recognizable evidence to support the Planning Board's Denial Resolution contained in the written administrative record.

305.    The Planning Board's Denial Resolution is arbitrary and capricious.

306.    The written record does not contain substantial evidence that would lead an objective and reasonable person to deny the applications to construct the Facilities.

307.    The Planning Board's Denial Resolution is in part based on alleged information not contained in the written record.

308.    The Planning Board's Denial Resolution is not supported by substantial evidence contained in the written record.

309.    The Planning Board's Denial Resolution is in violation of and preempted by 47 U.S.C. §332(c)(7)(B)(iii) and must be set aside and enjoined by the Court. Further, this Court should exercise its equitable power to issue an order directing the Defendants to issue all local permits and approvals required to construct the Hickory Lane Facility or, in the alternative, the Stone Hill Facility.

## COUNT II

### Violation of 47 U.S.C. §332(c)(7)(B)(i)(II)—Effective Prohibition

310.    The Plaintiff realleges and incorporates by reference all preceding paragraphs.

311.    Pursuant to 47 U.S.C. §§332(c)(7)(B)(i)(II), "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services."

312.    The Plaintiff has submitted documentation to establish, and the administrative record demonstrates, that there is a significant gap in wireless coverage in the area where the Facilities are proposed to be located.

313.    A gap in service is just one indicator of an effective prohibition of service in violation of federal law.  See In the Matter of Accelerating Wireless Broadband Deployment by Removing

Barriers to Infrastructure Inv., 33 FCCR 9088, 9104 (2018).

314.    The Facilities are personal wireless service facilities and will provide personal wireless services for the Plaintiff's network.

315.    There is not any alternative other than the Hickory Lane Facility and the Stone Hill Facility at issue here that would address the significant gap in service.

316.    There is no less intrusive alternative site or design that would address the gap in service.

317.    The Facilities are the least intrusive means for adequately addressing the gap in service identified here.

318.    The Defendant Planning Board's decision to deny the applications to construct the Facilities materially inhibits the Plaintiff's ability to provide its services and to compete in a fair and balanced regulatory environment.

319.    The Defendant Planning Board's decision to deny the applications to construct the Facilities effectively prohibits the provision of personal wireless services and facilities to current and future potential subscribers.

320.    The Defendants' acts and failures to act are in violation of and preempted by Section 332(c)(7)(B)(i)(II) of the Telecommunications Act, and must be set aside and enjoined on that basis. Further, this Court should exercise its equitable power to issue an order directing the Defendants to issue all local permits and approvals required for the construction of the Hickory Lane Facility or, in the alternative, the Stone Hill Facility.

## COUNT III

### Agency Preemption of a Technology Preference and the Supremacy Clause

321.    The Plaintiff realleges and incorporates by reference all proceeding paragraphs.

322. The FCC has clearly explained that state and local governments have no authority to establish or enforce technical standards or technology preferences for telecommunications services and personal wireless services.

323. The Denial Resolution states that a reason for the denial is that the Plaintiff did not consider small cells, thereby mandating a technology preference requirement.

324. Such a technology preference is preempted by and also a violation of the Telecommunications Act.

325. Defendants' acts and omissions are in violation of, and preempted by federal law and must be set aside and enjoined on that basis. Further, this Court should exercise its equitable power to issue an order directing Defendants to issue all local permits and approvals required to construct the Hickory Lane Facility or, in the alternative, the Stone Hill Facility.

## COUNT IV

### Violation of 47 U.S.C. § 253(a)
### Prohibition of Service and Bar To Entry

326. The Plaintiff realleges and incorporates by reference all preceding paragraphs.

327. 47 U.S.C. § 253(a) provides that "No state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

328. The Plaintiff has attempted to exercise its rights to provide telecommunications services in the Town since July 18, 2016.

329. The Plaintiff has attempted to exercise its rights to construct the Facilities to provide telecommunications services, and improve its service capabilities.

330. The Plaintiff has been forced to comply with the Defendants' unlawful

implementation of the Town Code, including the Cellular Law and Wireless Law, materially inhibiting the Plaintiff's ability to provide its services and to compete in a fair and balanced regulatory environment.

331. The review processes employed by the Defendants pursuant to the Town Code and the denial of the applications, obstruct, prevent and bar entry to the deployment of the Plaintiff's telecommunications facilities and services in the Town, all in violation of 47 U.S.C. § 253.

332. The Town Code, as applied to the Plaintiff's applications and by its terms, prohibits and has the effect of prohibiting the ability to provide telecommunication services within the meaning of § 253(a), and is thus preempted by the Telecommunications Act and the Supremacy Clause of the U.S. Constitution.

333. Defendants' acts and omissions and the Town Code are in violation of, and preempted by, Section 253 of the Telecommunications Act, and must be set aside and enjoined on that basis. Further, this Court should exercise its equitable power to issue an order directing Defendants to issue all local permits and approvals required to construct the Hickory Lane Facility or, in the alternative, the Stone Hill Facility.

## COUNT V

**Violation of 47 U.S.C. §332(c)(7)(B)(iv) –Denial of the Application Was Improperly Based on Perceived Health Effects from Radio Frequency Emissions**

334. The Plaintiff realleges and incorporates by reference all preceding paragraphs.

335. Section 332(c)(7)(B)(iv) of the Telecommunications Act provides that: "[n]o State or local government or instrumentality thereof may regulate the placement, construction and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions." 47 U.S.C. §332(c)(7)(B)(iv).

53

336. The Planning Board's actions and the denial set forth in the Denial Resolution were illegally based on unfounded fears of the environmental effects of radio frequency emissions.

337. The Defendants' acts are in violation of and preempted by Section 332(c)(7)(B)(iv) of the Telecommunications Act, and must be set aside and enjoined on that basis. Further, this Court should exercise its equitable power to issue an order directing the Defendants to issue all local permits and approvals required to construct the Hickory Lane Facility or in the alternative, the Stone Hill Facility.

WHEREFORE, the Plaintiff respectfully demands judgment of this Court on the Counts set forth above as follows:

1. On the First Count, an order and judgment finding that the denial was not based on substantial evidence contained in the written record and mandating that the Defendants immediately grant the Plaintiff's request as submitted and issue all necessary permits and authorizations for the Plaintiff to immediately begin the necessary work to construct the Hickory Lane Facility or, in the alternative, the Stone Hill Facility.

2. On the Second Count, an order and judgment finding that the Defendants have effectively prohibited personal wireless services and mandating that the Defendants immediately grant the Plaintiff's requests as submitted and issue all necessary permits and authorizations for the Plaintiff to immediately begin the necessary work to construct the Hickory Lane Facility or, in the alternative, the Stone Hill Facility.

3. On the Third Count, an order and judgment finding that the technological preference for small cell facilities is preempted by the regulatory actions of the FCC and violates the Supremacy Clause of the U.S. Constitution, and mandating that the Defendants immediately grant the Plaintiff's request as submitted and issue all necessary permits and authorizations for the Plaintiff to

immediately begin the work necessary to construct the Hickory Lane Facility or, in the alternative, the Stone Hill Facility.

4.    On the Fourth Count, an order and judgment finding that the Town Code effectively prohibits telecommunications services and mandating that the Defendants immediately grant the Plaintiff's requests as submitted and issue all necessary permits and authorizations for the Plaintiff to immediately begin the work necessary to construct the Hickory Lane Facility or in the alternative, the Stone Hill Facility.

5.    On the Fifth Count, an order and judgment finding that Defendants have improperly based the denial on the environmental effects of radio frequency emissions, beyond the extent that the Facility complies with the FCC's regulations concerning such emissions, and mandating that Defendants immediately grant the Plaintiff's request and issue all necessary permits and authorizations for the Plaintiff to immediately begin the work necessary to construct the Hickory Lane Facility or, in the alternative, the Stone Hill Facility.

6.    On all Counts, the Plaintiff's costs, expenses, and attorneys' fees, and any and all other damages and interest to which the Plaintiff is lawfully entitled, together with such other and further relief as the Court deems just and proper.

Dated:  Tarrytown, New York
          April 27, 2021

SNYDER & SNYDER, LLP
By:   /s/ Robert D. Gaudioso
          Robert D. Gaudioso
          Leslie J. Snyder
          *Attorneys for the Plaintiff*
          94 White Plains Road
          Tarrytown, New York 10591
          914.333.0700
          Rgaudioso@snyderlaw.net